AD HOC COMMITTEE ON JUDICIAL
ADMINISTRATION, etc., et al.,
Plaintiffs-Appellants,

v.

COMMONWEALTH OF MASSACHU-
SETTS et al., Defendants-
Appellees.

No. 73–1129.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1973.
Decided Dec. 20, 1973.

George W. Cameron, Jr., Montgomery, Ala., (court-appointed), for Rogers.

L. Wayne Collier, Montgomery, Ala. (court-appointed), for Tyson.

Ira DeMent, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before GEWIN, COLEMAN and MORGAN, Circuit Judges.

Jerry Cohen, Waltham, Mass., with whom Harold Brown, Boston, Mass., was on brief, for plaintiffs-appellants.

Lawrence T. Bench, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and Walter H. Mayo III, Asst. Atty. Gen., were on brief, for defendants-appellees.

Before COFFIN, Chief Judge, KILKENNY * and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

■ In a class action[1] brought under 42 U.S.C. § 1983, plaintiffs allege that

---

* Of the Ninth Circuit sitting by designation.

1. The class consists of all persons in the Commonwealth and the following subclasses: (1) all defendants in pending criminal proceedings; (2) all parties in all pending civil proceedings; (3) the state's judicial branch; (4) litigants of moderate or modest means represented by attorneys in the Ad Hoc Committee on Judicial Administration; (5) all persons of advanced age or in minority and underprivileged groups; and (6) all members of the Massachusetts bar.

Such a class composition poses problems. The group "all persons in the Commonwealth" most likely contains individuals with interests adverse to each other and to the class representatives, namely those desiring to retain the present system rather than pay, through higher taxes, for improvements. 3B Moore's Federal Practice ¶ 23.07 [3] (2d ed. 1969). Subclass (1) may be precluded by the Supreme Court's *ad hoc* approach to the right to speedy trial. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Defendants on the street awaiting trial may have interests adverse to those in jail; as witnesses die and memory fades, the prosecutor's burden of proof becomes more difficult. Persons in subclass (2) also may have antagonistic in-

Massachusetts' failure to provide "court facilities, judges, clerical personnel, and other facilities" violates their Sixth and Fourteenth Amendment rights. The federal judiciary is asked to order enlargement and restructuring of the entire state court system. Plaintiffs are an unincorporated association of Massachusetts attorneys and an elderly plaintiff in a pending Massachusetts civil suit. The defendants are the Commonwealth of Massachusetts, the state legislature and the governor.

The complaint charges that, through no procrastinating techniques of their own choosing, criminal defendants must wait well beyond one year to obtain a trial, and civil litigants must bide their time at least two years, but frequently four years or more. Such delay is said to deprive civil litigants of liberty and property without due process of law. A due process claim is also asserted on behalf of attorneys forced to endure "substantial confiscation of their opportunity to survive economically." Finally, the complaint alleges that the poor and elderly are deprived of equal protection of the laws because such groups are less able to withstand the effects of lengthy delay.

The prayer for relief asks the district court to order defendants to provide short and long term proposals to alleviate the congestion "and to implement such programs with adequate funding"; it further requests the court to fashion other orders necessary to resolve the court crisis and to retain jurisdiction in order to supervise its decree.

■ The district court dismissed the complaint for failure to state a justiciable cause of action, and on the ground that the Eleventh Amendment bars the action against defendants. 358 F.Supp. 953 (D.Mass.1973). We affirm on the first ground.[2]

Courts in Massachusetts, as in many other states, have been overtaken by an explosion of litigation, causing congestion and delays which defy solution even by the most active lawyers and jurists. *See* Annual Report of the Chief Justice of the Massachusetts Supreme Judicial Court, the Honorable G. Joseph Tauro, The State of the Judiciary, 57 Mass.L.

---

terests since delay arguably benefits civil defendants by making it harder for plaintiffs to win cases, postponing payment until date of judgment, and encouraging settlements. No legal interests were asserted on behalf of subclass (3). Subclasses (4) and (5), in addition to lacking identity of interests, use terms too vague, such as "moderate or modest means" and "advanced age", to define the class. Chaffee v. Johnson, 229 F.Supp. 445, 448 (S.D.Miss.1964), aff'd, 352 F.2d 514 (5th Cir. 1965), cert. denied, 384 U.S. 956, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966).

2. The Eleventh Amendment bars the action against the Commonwealth. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Although we refrain from deciding the question, the Amendment may also bar relief against the other defendants. Absent waiver, sovereign immunity generally precludes suits against state officers when the relief requested entails a direct levy of execution upon the state treasury, Hagood v. Southern, 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805 (1886), or an injunction ordering specific performance of a state's contract. In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887). If official action is unconstitutional, it does not preclude an injunction to halt such action. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Courts have not limited the Ex parte Young doctrine to "negative" relief, and have often ordered positive governmental action. In cases involving deprivation of constitutionally protected rights, "affirmative" relief has been granted, notwithstanding the fact that the incidental effect is that the state will be forced to expend funds from its treasury. *See, e. g.* Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Inmates v. Eisenstadt, 360 F.Supp. 676 (D.Mass.1973); Martarella v. Kelley, 349 F.Supp. 575 (S.D.N. Y.1972). However, in the "affirmative" relief cases, *supra*, the state still retains an option to avoid expenditures; it can, for instance, terminate all welfare programs. The Commonwealth, on the other hand, would not appear to have a constitutionally permissible alternative—to shut down all the courts rather than spend public funds. It is the lack of such an alternative that may create an Eleventh Amendment bar. *Cf.* Dugan v. Rank, 372 U.S. 609, 620–623, 83 S.Ct. 999, 10 L. Ed.2d 15 (1963); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 691, n. 11, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

Q. 209, 223–25 (1972). The problem is by no means limited to the state judiciary; the federal courts are likewise overtaxed. We do not dispute the general proposition that residents of the Commonwealth might well benefit from more judges and from enlarged court facilities. However, court-managed reshaping of government institutions—not to mention of other courts—is not a task to be undertaken lightly. Whether it is to be undertaken at all depends on "justiciability", a word used to distinguish causes which courts may properly handle from those they may not.

In Baker v. Carr, 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962), the Supreme Court defined justiciability as initially turning on "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."

██ The duty to be identified in the instant case is nothing less than a state's duty under the federal constitution to furnish timely judicial remedies for all its citizens and in all types and classes of litigation. The district court would have to translate the due process clause into formulae and timetables establishing the maximum permissible delay. This would not be easily done. To date, delay as an aspect of due process has been defined in the context of a particular case; a court looks at the effect of delay on the parties, at their diligence, at the nature of the case, and at the interests at stake. The Supreme Court has not quantified even in criminal cases the right to a speedy trial. "We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate." Barker v. Wingo, 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972). Whatever the extent of any correlative right in civil cases,[3] it would, as plaintiffs concede, be less than speedy. In any event, whether delay is a violation of due process depends on the individual case. Delay *per se* is not unconstitutional; it may become such only when an injured plaintiff, ready and eager for trial, or a defendant, seeking vindication and himself ready for trial, are denied for too long his day in court. If a five year delay in a civil action reflects simply the parties' utilization of pre-trial discovery or settlement negotiations there is no constitutional violation. To codify the myriad relevant elements into timetables of general application having constitutional force may well be impossible. Posner, An Economic Approach to Legal Procedure and Judicial Administration, 2 J. Legal Studies 399, 445–46 (1973).

Formulating the general duty is, moreover, plagued by other considerations such as whether the state's duty to afford a trial within a particular time differs as between classes of civil actions, or whether the constitution permits different timetables in different counties and regions. *See* Missouri v. Lewis, 101 U.S. 22, 30–31, 25 L.Ed. 989 (1879); Kail v. Rockefeller, 275 F.Supp. 937, 942 (E.D.N.Y.1967) (three-judge court).

If formulating a generalized constitutional duty applicable to the entire state court system is difficult, determining whether and in what respect the duty is being violated is equally so.[4] *See* A.B.A.

---

3. The extent of a person's right to have access to the state court remains uncertain. Boddie v. Connecticut, 401 U.S. 371, 382–383, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973); *cf.* United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973).

4. The reapportionment case relied upon by plaintiffs, Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), is inapposite. The duty in the reapportionment field is a readily understandable mathematical ideal. Kirkpatrick v. Preisler, 394 U.S. 526, 531, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). In *Mahan* the Court had no trouble in finding whether the state had deviated from absolute equality; it dealt only with whether such a deviation was justifiable. Moreover, even in the reapportionment area, sufficiently manageable standards do not always exist

Approved Standards Relating to Speedy Trial § 2.3 (1968); Rosenberg, Court Congestion: Status, Causes, and Proposed Remedies, in The Courts, The Public and The Law Explosion 29 (H. Jones, ed. 1965). Much of the delay from filing to trial can be attributed to a host of factors: discovery, negotiation, investigation, strategy, and, of course, counsel's engagement on other matters or even procrastination. To extrapolate from court statistics a picture of those cases where inability to obtain a trial has reached due process proportions is difficult.[5]

Most difficult of all, however, would be for the district court to attempt to mold a remedy. *See* De Kosenko v. New York, 311 F.Supp. 126, 128 (S.D.N.Y. 1969); Kail v. Rockefeller, 275 F.Supp. 937 (E.D.N.Y.1967); New York State Association of Trial Lawyers v. Rockefeller, 267 F.Supp. 148, 154 (S.D.N.Y. 1967); Buchanan v. Rhodes, 249 F. Supp. 860 (N.D.Ohio 1966), app. dismissed, 385 U.S. 3, 87 S.Ct. 33, 17 L.Ed. 2d 3 (1966); rev'd on other grounds, 400 F.2d 882 (6th Cir. 1968), cert. denied, 393 U.S. 839, 89 S.Ct. 118, 21 L. Ed.2d 110 (1968). Plaintiffs apparently see the district court as ordering needed manpower and physical resources; but it is not clear that additional judges mean less congestion. The increase of 45 judges in New York over a ten year span had no appreciable effect on the waiting period. Desmond, Current Problems of State Court Administration, 65 Colum.L.Rev. 561, 562–63 (1965). Improved facilities may, indeed, merely channel more cases into the overburdened state system;[6] the better alternative might be to close the courthouse to certain types of litigation, as occurred when "no-fault" insurance was adopted in Massachusetts.

In any event, a federal judge faced with the awesome task of ordering measures to cut down the waiting period in a state's judiciary could hardly consider merely the augmentation of resources. He would also have to inquire into the administration of the system, its utilization of personnel, the advisability of requiring adoption of techniques such as pre-trial conferences, different calendar arrangements, split trials, and the like, and countless other administrative matters about which books have been written and courses taught, and as to the relative value of which there remains much dispute.

■ Related to the manageability of relief are other considerations that bear on justiciability. A question is nonjusticiable if it turns on policy determinations outside judicial discretion. Baker v. Carr, *supra,* 369 U.S. at 217, 82 S.Ct. 691. In this nation, the financing and, to an important extent, the organization of the judicial branches, federal and state, have been left to the people, through their legislature. While state courts have on rare occasions ordered the provision of assistance from the other branches, when they deemed their very capacity to continue functioning at stake, *e. g.,* O'Coins, Inc. v. Treasurer of County of Worcester, Mass., 287 N.E.2d 608 (S.J.C.1972), it would be both unprecedented and unseemly for a federal judge to attempt a reordering of

to enable the courts to measure breach. The Court recently held that minor deviations do not constitute *prima facie* invidious discrimination, stressing the fact that statistical errors in all census reports as well as shifting population composition mean courts just do not have sufficiently reliable data to ascertain whether a person's vote has been diluted. Gaffney v. Cummings, 412 U.S. 735, 745–747, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

5. Plaintiffs presumably would have the court either ignore state provisions which permit the advancement of criminal and civil cases on an *ad hoc* basis or presume their ineffectiveness. M.G.L.A. c. 277 §§ 72, 72A; c. 231 § 59A.

6. The difficulty with predicting the effect of granting the relief plaintiffs request further distinguishes the instant case from other affirmative relief situations. *See, e. g.,* United States v. Montgomery County Bd. of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972).

state priorities. One cannot say that such action could never be justified if the constitution should require, but even the serious facts and circumstances alleged in the complaint do not convince us that the proposed cure would be better than the disease. Some federal courts have, it is true, involved themselves in the adequate financing of state institutions by ordering a state to furnish certain levels of medical and psychiatric care to those involuntarily committed.[7] But in these cases the courts indicated, either implicitly or explicitly, that unless the specific additional services required in order to pass constitutional muster were provided by the state, the facilities in question would be closed. Here, not only is the court unable to articulate a specific standard of "judicial" services which the constitution is thought to require, but any implied threat to close down the state court system if such a standard were not achieved would amount to little more than a quixotic and unwarranted intrusion into an entire branch of state government.

Moreover, one might doubt the wisdom of casting a federal district court in the role of receiver for a state judicial branch. *Cf.* Younger v. Harris, 401 U.S. 37, 44–45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). While the state judiciary might appreciate additional resources, it would scarcely welcome the intermeddling with its administration which might follow. The dictates of a federal court might seem to promise easy relief; yet they would more likely frustrate and delay meaningful reform which, in a system so complex, cannot be dictated from outside but must develop democratically from within the state.

The courts always remain open in individual cases to complaints of unconstitutional deprivation through delay.

And, of course, principles announced in one case may be such as to control other—possibly many other—later cases. But we decline to ask the federal district court to forego its usual adjudicatory role in favor of the sweeping administrative and legislative functions urged upon us.

Affirmed.

---

7. Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1967); Wyatt v. Stickney, 334 F.Supp. 1341 (N.D.Ala.1971); *contra* Burnham v. Department of Public Health, 349 F.Supp. 1335, 1341–1343 (N.D.Georgia 1972); see generally Schwitzgebel, Right to Treatment for the Mentally Disabled, 8 Harv.Civ.Rights—Civ.Lib.L.Rev. 513 (1973).