979 F.2d 697
 61 USLW 2287
 LOS ANGELES COUNTY BAR ASSOCIATION, a Non-profit Mutual
Benefit Corporation, Plaintiff-Appellant,
v.
March Fong EU, Secretary of State of the State of
California, in her official capacity; Pete Wilson, Governor
of the State of California; Willie Brown, Junior, Speaker
of the Assembly of the State of California; David Roberti,
President Pro Tem of the Senate of the State of California,
Defendants-Appellees.
 No. 91-55876.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 8, 1992.
Decided Oct. 30, 1992.
 
 Richard Chernick, Gibson, Dunn & Crutcher, Los Angeles, Cal., for plaintiff-appellant.
 Henry G. Ullerich, Interim Asst. Atty. Gen., Los Angeles, Cal., for defendants-appellees.
 Bion M. Gregory, Legislative Counsel of the State of Cal., and David B. Judson, Deputy Legislative Counsel, Sacramento, Cal., for defendants-appellees, William L. Brown, Jr., Speaker of Assembly of State of Cal., and David Roberti, President Pro Tem of Senate of State of Cal.
 Appeal from the United States District Court for the Central District of California.
 Before: FLETCHER, O'SCANNLAIN, and KLEINFELD, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 The Los Angeles County Bar Association challenges the constitutionality of a California statute which prescribes the number of judges on the Superior Court for Los Angeles County. The Bar Association asserts that a shortage of state court judges causes inordinate delays in civil litigation, depriving litigants of access to the courts. The Bar Association also claims the statute denies local litigants equal protection of the laws because it forces them to suffer longer delays than litigants in neighboring counties. The federal district court granted summary judgment in favor of the Secretary of State and Governor of California, the Speaker of the California Assembly, and the President Pro Tem of the California Senate ("state officers") and the Bar Association appeals.
 
 
 2
 * The Superior Court is California's court of general jurisdiction. Cal. Const. art. 6, § 10. The legislature determines the number of judges assigned to the Superior Court of each county. California Government Code section 69586 currently authorizes 224 superior court judges for Los Angeles County, and allows the appointment of up to 14 more at the option of the county.[1]
 
 
 3
 The parties agree that the Superior Court for Los Angeles County is badly overburdened. Because criminal, juvenile, and certain family law actions are given priority, most civil actions proceed at a less-than-rapid pace. The record indicates that for civil jury trials held in June 1988, the median time from filing to trial was fifty-nine months. In 1989, only 50% of all civil cases in Los Angeles County were resolved in less than two years, 90% were resolved in 4.2 years, and 98% in 6.3 years.
 
 
 4
 Although at first glance these statistics are discouraging, closer scrutiny reveals that the situation has improved considerably in the last decade. As of June 30, 1980, there were 72,072 civil cases awaiting trial in Los Angeles County Superior Court. Eight years later, that backlog had been reduced to 32,803. During the same period, the average time from filing of an at-issue memorandum to jury trial decreased from thirty-six months to twenty-six months. The number of cases filed per judicial position (1034) in Los Angeles County is not unusually high; for fiscal year 1987-88, the Superior Court for thirty-six of California's fifty-eight counties experienced higher numbers of filings per judge.
 
 
 5
 In November 1987, the Bar Association filed a complaint commencing this action against state officers in federal district court, seeking a declaration that Government Code section 69586 violates federal and state constitutional guarantees.[2] The parties filed cross-motions for summary judgment. In June 1991, the district court granted the state officers' motions and denied the Bar Association's. This timely appeal followed.
 
 II
 
 6
 The state officers do not question the Bar Association's standing to pursue this action. Nonetheless, standing is a threshold question which we must resolve before proceeding to the merits. Associated General Contractors v. Coalition for Economic Equity, 950 F.2d 1401, 1405 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); see also Warth v. Seldin, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975); McMichael v. County of Napa, 709 F.2d 1268, 1269 (9th Cir.1983).
 
 
 7
 To establish standing, a plaintiff must demonstrate a sufficient personal stake in the outcome to justify invocation of the judicial process. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The "case or controversy" requirement of Article III precludes the exercise of jurisdiction by a federal court unless the plaintiff has suffered some actual injury or faces a threatened injury fairly traceable to the action challenged and likely to be redressed by a favorable decision. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). At the summary judgment stage, the plaintiff must set forth specific facts, rather than mere allegations, that if true would suffice to establish standing. Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992).
 
 
 8
 In its complaint, the Bar Association alleges that it is, in its own right, a civil litigant in the Los Angeles County courts, and as such has suffered delays.[3] Complaint at p 38. We conclude that this status as a litigant gives the Bar Association standing. Because the Bar Association has standing in its own right, we need not determine whether it also has standing as the representative of its members.
 
 
 9
 Article III mandates that the injury alleged, in addition to being actual and personal, be caused by the challenged action and be "likely to be redressed by a favorable decision." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The party seeking to invoke the court's powers must carry the burden of showing that more than "speculative inferences" connect the injury to the challenged action. Id. at 45, 96 S.Ct. at 1927. If causation and redressability depend upon "unfettered choices made by independent actors not before the courts," ASARCO Inc. v. Kadish, 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989), the plaintiff bears the burden of "adduc[ing] facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Defenders of Wildlife, --- U.S. at ----, 112 S.Ct. at 2137.
 
 
 10
 The chain of causation leading from a determination by this court that the dearth of judges in Los Angeles County is unconstitutional to correction of civil litigation delays may appear tenuous. However, it does not at any point depend upon the "unfettered discretion" of third parties. Were this court to issue the requested declaration, we must assume that it is substantially likely that the California legislature, although its members are not all parties to this action, would abide by our authoritative determination. See Franklin v. Massachusetts, --- U.S. ----, ----, 112 S.Ct. 2767, 2777, 120 L.Ed.2d 636 (1992) (plurality). Once the legislature authorized more judicial positions for Los Angeles County, Governor Wilson would, according to the Bar Association, have a legal duty to fill those positions. Complaint at pp 29-30. Even if the new judges were assigned only to criminal and other high-priority cases, the speeding of those cases would inevitably reduce the delay in general civil litigation. We therefore conclude that the Bar Association has adequately demonstrated that, were this court to rule in its favor, it is likely that the alleged injury would be to some extent ameliorated.
 
 III
 
 11
 The state officers contend that this case presents a non-justiciable political question. They argue that the determination of the appropriate number of judges to be assigned to each county's courts must be left to the state legislature because it requires a delicate balancing of competing interests. Further, they contend that no judicially determinable standards exist for resolving the Bar Association's claims.
 
 
 12
 In the seminal case of Baker v. Carr, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), Justice Brennan, writing for the Court, explained that the political question doctrine arises from "the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States." The Court reiterated in Powell v. McCormack, 395 U.S. 486, 517, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491 (1969), that the political question doctrine arises primarily from concerns about the separation of powers within the federal government. See also Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."). Accordingly, the doctrine has at best limited applicability to actions challenging state statutes as violative of the federal Constitution. Davids v. Akers, 549 F.2d 120, 126 (9th Cir.1977).
 
 
 13
 Baker identified six factors which may render an issue non-justiciable:
 
 
 14
 a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 15
 Baker, 369 U.S. at 217, 82 S.Ct. at 710. Only two of these factors, lack of judicially manageable standards and the need for an initial non-judicial policy determination, are potentially implicated in cases involving the relationship between federal and state governments rather than the relationship between coequal branches of the federal government.
 
 
 16
 The Supreme Court has noted that the "narrow categories of 'political questions' " defined in Baker should not be transformed into "an ad hoc litmus test of this Court's reactions to the desirability of and need for judicial application of constitutional or statutory standards to a given type of claim." Davis v. Bandemer, 478 U.S. 109, 126, 106 S.Ct. 2797, 2807, 92 L.Ed.2d 85 (1986). The mere fact that a decision "may have significant political overtones" does not allow a court to avoid deciding it. Japan Whaling, 478 U.S. at 230, 106 S.Ct. at 2866. So long as the nature of the inquiry is familiar to the courts, the fact that standards needed to resolve a claim have not yet been developed does not make the question a non-justiciable political one. United States v. Munoz-Flores, 495 U.S. 385, 395-96, 110 S.Ct. 1964, 1970-71, 109 L.Ed.2d 384 (1990).
 
 
 17
 We conclude that the questions presented by this appeal are justiciable. The Bar Association asserts that delays in Los Angeles Superior Court deprive litigants of their rights to due process and equal protection. Judicial standards for evaluating compliance with the constitutional dictates of due process and equal protection are well developed, although they have not often been applied to these facts. Nothing about the Bar Association's claims removes them from the institutional competence of the judiciary. Cf. Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973) (action seeking ongoing judicial supervision of composition, training, and control of National Guard held non-justiciable); United States v. Mandel, 914 F.2d 1215, 1222-23 (9th Cir.1990) (no meaningful standards for judicial review of executive decision to impose export controls on a particular commodity); Tiffany v. United States, 931 F.2d 271, 279 (4th Cir.1991) (no judicially manageable standards for determining whether necessities of national defense justify risks posed to civilian aircraft by conduct of military jets), cert. denied, --- U.S. ----, 112 S.Ct. 867, 116 L.Ed.2d 773 (1992).
 
 
 18
 The Supreme Court's decisions in Baker and Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), rejecting claims that challenges to the apportionment of state legislatures present non-justiciable political questions, control our resolution of the justiciability issue in this case. "Disposition of this question does not involve us in a matter more properly decided by a coequal branch of our Government. There is no risk of foreign or domestic disturbance, and ... we are not persuaded that there are no judicially discernible and manageable standards by which [this case is] to be decided." Davis, 478 U.S. at 123, 106 S.Ct. at 2805. Responsibility for the appropriate distribution of state court judges is no more strongly vested in the state legislature than the redistricting power. In both cases, the legislature's decision must comply with the requirements of the federal Constitution, as declared by the federal courts.
 
 
 19
 In holding the issues presented in this case justiciable, we decline to follow the First Circuit, which reached a contrary conclusion in Ad Hoc Committee on Judicial Administration v. Massachusetts, 488 F.2d 1241 (1st Cir.1973), cert. denied, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974). We note that the complaint in that case sought intrusive injunctive relief including continuing federal judicial supervision of the state court system. See id. at 1243-44. By contrast, the Bar Association seeks only a declaration that Government Code section 69586 violates the state and federal constitutions, leaving the state free, in the first instance to determine how best to remedy the violation. Moreover, we frame the issues a bit differently than did the First Circuit. Our colleagues correctly noted that it would be very difficult for courts to determine how much delay was constitutionally acceptable in any given case. Ad Hoc Committee, 488 F.2d at 1244. We choose, however, to examine the issue as it is presented to us by the Bar Association: does the average time to resolution of civil cases in Los Angeles Superior Court violate the rights asserted by the Bar Association? As so framed, we believe the issue is susceptible of judicial determination.
 
 IV
 
 20
 State officers Eu and Wilson urge that, even if this case is justiciable, we should, in the exercise of our discretion, hold that declaratory relief would be inappropriate. See United States v. Washington, 759 F.2d 1353, 1356-57 (9th Cir.) (en banc), cert. denied, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985). This argument has some force. While separation of powers issues are not implicated in this situation, principles of federalism, comity, and institutional competence emphatically are. We should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system. See Rizzo v. Goode, 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976); O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Stone v. City and County of San Francisco, 968 F.2d 850, 852, 860-61 (9th Cir.1992). When the relief sought would require restructuring of state governmental institutions, federal courts will intervene only upon finding a clear constitutional violation, and even then only to the extent necessary to remedy that violation. See Milliken v. Bradley, 433 U.S. 267, 281-82, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977); Society of Separationists v. Herman, 959 F.2d 1283, 1286 (5th Cir.1992) (en banc), petition for cert. filed July 14, 1992 (No. 920-116).
 
 
 21
 Although the relief sought by the Bar Association would not directly require supervision of the state court system by federal judges, it would inevitably require restructuring of that system. Subsequent federal actions exploring the contours of the speedy civil litigation right we would necessarily announce in issuing such a declaration would be virtually certain.
 
 
 22
 While we find state officers Eu and Wilson's invitation to avoid confronting the merits tempting, we do not accept it. In determining whether to exercise declaratory jurisdiction, federal courts should consider whether a declaratory judgment will serve a useful purpose in clarifying and settling the legal relations between the parties, and whether it will terminate the controversy. James Wm. Moore, Jo Desha Luca, 6A Moore's Federal Practice and Procedure p 57.08 (2d ed. 1991).
 
 
 23
 In using the term "settling the controversy," courts do not require that the broader controversy, i.e. the manifold and multifarious issues and legal relationships and interrelationships of the entire dispute, be put at rest by the declaratory remedy. However, the controversy to be determined in the declaratory action must itself be an autonomous and independent dispute, involving issues of vital importance to the parties involved.
 
 
 24
 Id. at p 57.08 (footnotes omitted). The present action meets these requirements. If we were to issue a declaration in the Bar Association's favor, it would resolve a substantial and important question currently dividing the parties.
 
 
 25
 The Bar Association has chosen to frame its challenge as, in effect, a facial one, citing average court delays rather than the delay in any specific case as unconstitutional. The relevant facts are clear: the parties have provided us with statistics detailing average times to resolution in civil cases. Further factual development will not assist our consideration of this claim. We therefore conclude, although not without some trepidation, that this case is a proper one for the exercise of our declaratory jurisdiction.
 
 V
 
 26
 State officers Eu and Wilson also contend that we lack jurisdiction under the Eleventh Amendment. This argument is not well taken.
 
 
 27
 The Eleventh Amendment generally bars the federal courts from entertaining suits brought by a private party against a state or its instrumentality in the absence of state consent. Los Angeles Branch NAACP v. Los Angeles Unified School Dist., 714 F.2d 946, 950 (9th Cir.1983), cert. denied, 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984). However, the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities. Ex Parte Young, 209 U.S. 123, 155-56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908); Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974).
 
 
 28
 The rule of Ex Parte Young "gives life to the Supremacy Clause" by providing a pathway to relief from continuing violations of federal law by a state or its officers. Green v. Mansour, 474 U.S. 64, 69, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985). Declaratory relief against a state official may not be premised on a wholly past violation of federal law, because such relief would not serve the federal interest in assuring future compliance with federal law, and would be useful only as a basis for a damage award in a subsequent state proceeding. See id. at 73, 106 S.Ct. at 428. "On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury." Papasan v. Allain, 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986); see also Milliken v. Bradley, 433 U.S. 267, 288-90, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977) (injunction requiring state officials to eliminate prospectively all vestiges of de jure segregated school system not barred by Eleventh Amendment). The Eleventh Amendment presents no barrier to the Bar Association's request for declaratory relief against an alleged ongoing violation of federal law.
 
 
 29
 Eu and Wilson also claim Eleventh Amendment immunity on the basis of an alleged lack of connection with enforcement of the challenged statute. Under Ex Parte Young, the state officer sued "must have some connection with the enforcement of the [allegedly unconstitutional] act." 209 U.S. at 157, 28 S.Ct. at 453. This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit. Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir.1992); Los Angeles Branch NAACP, 714 F.2d at 953.
 
 
 30
 This suit, however, is not based on any asserted general duty to enforce state law. Eu and Wilson have a specific connection to the challenged statute. Wilson has a duty to appoint judges to any newly-created judicial positions, and Eu has a duty to certify subsequent elections for those positions. The lack of any enforcement proceeding by Eu and Wilson against the Bar Association under the challenged statute does not preclude this suit. Government Code section 69586 is currently being given effect by state officials, including Eu and Wilson. It is simply not the type of statute that gives rise to enforcement proceedings.VI
 
 
 31
 Having determined that we have jurisdiction and that this case is justiciable, we now consider the merits of the Bar Association's claims. The Bar Association first asserts that Government Code section 69586 infringes upon what it refers to as the fundamental right of access to the courts in civil litigation.[4]
 
 
 32
 The Supreme Court has recognized a right of access to the courts in several distinct situations. First, the Court has recognized the right to sue and to defend in court as one of the privileges and immunities of citizenship that may not be denied by one state to citizens of another. Chambers v. Baltimore & Ohio R.R., 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). In Chambers, the Court did not pretend to determine what level of judicial access must be provided. It simply held that the state's courts must be opened equally to citizens and non-citizens of the forum state. Id. The Bar Association makes no claim that non-residents of California suffer inordinate delays in the Los Angeles courts not suffered equally by residents; consequently, this aspect of the right to access need not concern us here.
 
 
 33
 More to the point, the Supreme Court has held that the Due Process Clause of the Fourteenth Amendment encompasses a right of access to the courts to allow vindication of fundamental rights that cannot be otherwise protected. Thus, because of "the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship," indigent persons may not be required to pay a filing fee for a divorce action. Boddie v. Connecticut, 401 U.S. 371, 374, 91 S.Ct. 780, 784, 28 L.Ed.2d 113 (1971). However, in Boddie the Court recognized that "our society has been so structured that resort to the courts is not usually the only available, legitimate means of resolving private disputes." Id. at 375, 91 S.Ct. at 784. Where "effective alternatives for the adjustment of differences remain," the state may make its judicial system unavailable without offending the federal Constitution. Id. at 375-76, 91 S.Ct. at 784-85. For example, a filing fee may legitimately be imposed by the bankruptcy courts, even if such a fee precludes access to those courts by indigents. United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). Similarly, indigent litigants seeking judicial review of an agency determination of ineligibility for welfare benefits may be forced to pay a filing fee. Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (per curiam).
 
 
 34
 The Court has also recognized that prisoners "have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). This right has been characterized as "fundamental." Id. at 828, 97 S.Ct. at 1498. The Court has described it as an element of both the First Amendment right to petition the government for redress of grievances, Hudson v. Palmer, 468 U.S. 517, 522, 104 S.Ct. 3194, 3197, 82 L.Ed.2d 393 (1984), Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam), and the Due Process clause, Wolff v. McDonnell, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974). It appears in significant part to be based on the same concerns that animated Boddie. Because prisoners are typically indigent, often ignorant and illiterate, and due to their confinement generally unable to avail themselves of traditional modes of legal assistance, the state must provide them with law libraries and allow them access to some form of legal assistance. See Bounds, 430 U.S. at 821-25, 97 S.Ct. at 1494-96; Johnson v. Avery, 393 U.S. 483, 487, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). Like the filing fee cases, the prisoner cases are founded in large part on the importance of the rights concerned and the prisoners' inability to vindicate them through non-judicial pathways. See, e.g., Bounds, 430 U.S. at 827, 97 S.Ct. at 1497 (explaining that prisoner actions generally seek new trials, release from confinement, or vindication of fundamental civil rights).
 
 
 35
 Finally, the right of access to the courts has been described as "one aspect of the right to petition" protected by the First Amendment. California Motor Transp. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). Thus, the antitrust laws must allow good-faith resort to administrative and judicial channels for the purpose of advocating one's point of view. Id. at 511, 92 S.Ct. at 612. Similarly, a government agency may not constitutionally revoke a permit or withhold legally required payments in retaliation for the filing of a court action. Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir.1989); Silver v. Cormier, 529 F.2d 161, 163 (10th Cir.1976).
 
 
 36
 All of the cases discussed above involve the right to pass through the courthouse doors and present one's claim for judicial determination. See, e.g., Boddie, 401 U.S. at 382, 91 S.Ct. at 788 ("the Due Process Clause of the Fourteenth Amendment requires that these appellants be afforded an opportunity to go into court to obtain a divorce") (emphasis added); Wolff, 418 U.S. at 579, 94 S.Ct. at 2986 ("The right of access to the courts ... assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights.") (emphasis added). The same holds true for most of the other cases offered by the Bar Association and amici. See, e.g., Morrison v. Lipscomb, 877 F.2d 463 (6th Cir.1989) (complaint challenging moratorium that temporarily excluded a class of cases from the courts stated a viable constitutional claim); Bowman v. Niagara Machine & Tool Works, Inc., 832 F.2d 1052, 1054-55 (7th Cir.1987) (state statute of repose does not infringe right of access to courts because judicial process remains open); Ryland v. Shapiro, 708 F.2d 967 (5th Cir.1983) (charge that state officers covered up facts of murder by policeman, interfering with right of survivors to file wrongful death claim, stated a claim under § 1983); Jackson v. Procunier, 789 F.2d 307 (5th Cir.1986) (prison officials allegedly deliberately interfered with mailing of prisoner's in forma pauperis petition in civil appeal, causing appeal to be dismissed).
 
 
 37
 Notwithstanding the fundamental rights of access to the courts, the Bar Association does not cite, nor has our independent research revealed, any decision recognizing a right to judicial determination of a civil claim within a prescribed period of time as an element of such right. The Bar Association proposes that we simply establish as a federal constitutional requirement aspirational standards promulgated by the American Bar Association and California Judicial Council calling for resolution of all civil cases within two years of filing. While these standards surely set worthy goals, we can find no basis in the Constitution for a rigid right to resolution of all civil claims within such a time frame.
 
 
 38
 Even in the context of criminal actions, where the Constitution specifically recognizes a right to speedy trial, the Supreme Court has acknowledged that determination of whether delay exceeds constitutional boundaries requires an ad hoc inquiry into the particular circumstances of each case. Barker v. Wingo, 407 U.S. 514, 521-23, 92 S.Ct. 2182, 2187-88, 33 L.Ed.2d 101 (1972). This is even more true in the civil context, where the speed with which a case progresses may vary with the amount of discovery required, the time spent on settlement negotiations, and even the tendency of one side or the other to engage in delaying tactics. Furthermore, the time from submission of an issue to issuance of a judicial opinion may be significant. Given the risks to the quality of judicial decisionmaking implicit in hasty or forced action, we are unwilling to suggest that the Constitution may dictate or even countenance a time limit on the consideration a judge may give to a civil case. This is not to suggest, however, that there may be no outer limit. On this record we simply do not face that issue.
 
 
 39
 Carrying out the case-by-case examination suggested by Baker, we conclude that, on this record, the Bar Association's facial challenge to average delays cannot succeed. The Bar Association has not provided any evidence that the average length of civil proceedings in Los Angeles Superior Court leads to inaccurate decisions or ineffective relief, or even that court delays have ever deprived any Los Angeles County litigant of the ability to vindicate important rights. Furthermore, we are unable to discern, on this record, how much of the average delay must be attributed to the state's administration of the judicial system, and how much is properly laid at the feet of the litigants themselves. To that extent, we agree with our colleagues on the First Circuit that "[d]elay per se is not unconstitutional." Ad Hoc Committee, 488 F.2d at 1244. This record reveals nothing that would enable this court to hold that the delays should be elevated to violations with constitutional stature.
 
 
 40
 In so holding, we do not discount the possibility that litigation delays in certain circumstances could effectively deprive individual litigants of the ability to vindicate fundamental rights.[5] Such delay might violate due process. On this record, however, we discern no constitutional violation.
 
 
 41
 The Bar Association also alleges that California's five-year mandatory dismissal statute, Cal.Code Civ.Proc. § 583.360 (West Supp.1992), in combination with the delays in the Los Angeles courts, violates due process. Curiously, the Bar Association does not challenge the constitutionality of section 583.360. Nor does it cite to any instance in which court congestion has caused delays leading to dismissal under this statute, effectively preventing vindication of fundamental rights. Again we must conclude that the Bar Association has failed to make out a claim of constitutional dimension.
 
 VII
 
 42
 We next confront the Bar Association's equal protection challenge to section 69586. Pointing out that delays in Los Angeles Superior Court are worse than those in many (but concededly not all) other California counties, the Bar Association contends that the disparity deprives Los Angeles litigants of the equal protection of the laws.[6] Citing Attorney General v. Soto-Lopez, 476 U.S. 898, 904, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 (1986) (plurality opinion), the Bar Association asserts that heightened scrutiny should be applied to this claim. We disagree. The Soto-Lopez plurality concluded that intensified scrutiny was appropriate because the challenged statute infringed upon the fundamental right to travel interstate. No interstate migration interest is infringed upon by section 69586. Section 69586 does not classify persons on the basis of any suspect characteristic and, as explained above, the Supreme Court has never recognized a fundamental right to judicial resolution of civil actions within a prescribed period of time. We therefore conclude that the Bar Association's equal protection claim should be measured against the rational basis test. See Kras, 409 U.S. at 446, 93 S.Ct. at 638 (applying rational basis test to claim that bankruptcy filing fees violate equal protection because no fundamental interest at stake).
 
 
 43
 The Fourteenth Amendment's equal protection clause does not require that states treat all persons within their borders identically. See McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others" so long as the classification does not rest on grounds "wholly irrelevant to the achievement of the State's objective"). In particular, territorial uniformity in the administration of justice is not required. Consistent with the federal Constitution a state "may establish one system of courts for cities and another for rural districts, one system for one portion of its territory and another system for another portion." Ocampo v. United States, 234 U.S. 91, 99, 34 S.Ct. 712, 715, 58 L.Ed. 1231 (1914). See also Salsburg v. Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954) (rules of evidence need not be uniform throughout state). We agree with the District Court for the Eastern District of New York that, so long as the state's judicial system is rationally designed, a "uniform timetable for the trial of all cases within the State is not required by the Fourteenth Amendment." Kail v. Rockefeller, 275 F.Supp. 937, 942 (E.D.N.Y.1967).
 
 
 44
 Measured against the rational basis test, section 69586 easily passes muster. It is not irrational for the state to determine that schools and universities, medical services for indigents, or any one of a number of other programs should receive a portion of the state's available funds, limiting the funds available for the judicial system. In distributing these limited funds, the state could rationally decide that longer delays can be tolerated in the large urban centers in order to ensure that each county has at least a courthouse and minimal judicial facilities.
 
 
 45
 Furthermore, the problem of litigation delay can be addressed in numerous ways other than by provision of additional judges, and the legislature could rationally choose to pursue such other methods. Indeed, in recent years, the California legislature has made some effort to reduce litigation backlogs, and that effort has enjoyed at least a measure of success. In 1986, California passed the Trial Court Delay Reduction Act, Cal.Gov't Code §§ 68600-68620 (West Supp.1992), which concentrates on delay reduction through case management techniques. The statistics in the record suggest that the Delay Reduction Act has helped reduce, though it surely has not eliminated, California's civil backlog. We cannot say that the California legislature's decision to address court delays primarily through case management techniques rather than multiplication of judicial positions is irrational.
 
 VIII
 
 46
 We are acutely aware of the difficulties caused by court delays, and of the seeming intractability of the problem. Nonetheless, we cannot find in the Constitution any requirement that all civil actions must be completed within a prescribed time. Consequently, we reject the Bar Association's claims that the slow pace of civil litigation in Los Angeles County violates the Constitution.
 
 
 47
 AFFIRMED.
 
 KLEINFELD, Judge, concurring:
 
 48
 I concur in the result, but would not reach the merits. I do not think we have the power to tell the people of California that they must hire more judges to serve Los Angeles County.
 
 
 49
 The plaintiffs have cited no precedent for the relief they seek. In the only case closely in point, the First Circuit held that a claim such as the one before us is nonjusticiable. Ad Hoc Committee on Judicial Administration v. Massachusetts, 488 F.2d 1241 (1st Cir.1973), cert. denied, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974). "In this nation, the financing and, to an important extent, the organization of the judicial branches, federal and state, have been left to the people, through their legislature." Id. at 1245. Besides being the only decision of a federal appellate court on point, the Ad Hoc Committee decision is well reasoned and persuasive. I would follow it.
 
 
 50
 The majority distinguishes Ad Hoc Committee because the plaintiffs in that case sought an injunction, but in our case, they seek a declaratory judgment. The distinction is correct, but the rationale of Ad Hoc Committee applies in large part to declaratory judgments. Ad Hoc Committee held that the claim, that Massachusetts provided inadequate court facilities, judges and personnel, was not justiciable because: (1) there was no constitutional standard by which to measure maximum permissible delay in civil cases, adequacy of court facilities and adequate numbers of judges and other court personnel; (2) a court could not fashion appropriate relief without inquiring into the local details of judicial administration; and (3) the policy determinations regarding financing and organization of the judicial branch of government are traditionally made by the people through their legislature. The first and third reasons apply as much to declaratory judgments as injunctions, and they are enough to make the claim nonjusticiable.
 
 
 51
 Though Baker v. Carr, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), has been interpreted to limit the political question doctrine to the relationships among branches of the federal government, I am not sure this is a correct reading of the case. Although the political question doctrine has been held inapplicable in "carefully delineated situations," mainly voting rights cases representing "the Court's efforts to strengthen the political system by assuring a higher level of fairness and responsiveness to the political processes," we should not "assume its demise." Gilligan v. Morgan, 413 U.S. 1, 11, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). The second and third factors Baker identifies as possibly rendering an issue nonjusticiable apply to the case before us. They are "lack of judicially discoverable and manageable standards for resolving it," and "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." Id. 369 U.S. at 217, 82 S.Ct. at 710.
 
 
 52
 Even if the political question doctrine does not apply, a case may be nonjusticiable under doctrines of mootness, ripeness, standing, and a residue of other reasons. Cf. Davids v. Akers, 549 F.2d 120 (9th Cir.1977). In Baker v. Carr, the democratic process within state government was impaired by the very problem, malapportionment of the state legislature, which brought the case to court, so deference to state policy choices would prevent any organ of government from listening to those excluded from equal participation in the state political process. We have not been advised of any defect in the democratic system of the State of California which disables it from making its own judgments about how much money to put into courts, schools, welfare, police, highways, and other government activities. The allocation of 238 judges to Los Angeles County is not a kind of legislation which "restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation." United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938).
 
 
 53
 Even if we had jurisdiction, I would not think a declaratory judgment appropriate. Declaratory judgments are discretionary. United States v. Washington, 759 F.2d 1353, 1356-57 (9th Cir.) (en banc), cert. denied, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985). The court of appeals "must exercise its own sound discretion," and declaratory relief should be denied where "it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." Id. We cannot properly declare that the state legislative decision to allocate 224 or 238 judges to Los Angeles County is wrong, where there are no legal standards to say what number is right.
 
 
 54
 We cannot clarify and settle the question of how many judges the federal constitution requires the State of California to allocate to Los Angeles County. A declaratory judgment that the present number violates the Constitution would beg the question of how many would satisfy the Constitution. Nor can we provide any statement of law which will end the controversy. The Due Process Clause does not generate a formula for percentages of civil cases which must be resolved within two, three or five years. Ad Hoc Committee, 488 F.2d at 1244. Were we to try to evaluate the relationship between number of judges and delay, we would also have to consider methods of judicial administration within the state court system, receptiveness of the state system to various types of claims, undesirability of delay in litigation relative to benefits of allocating resources to other uses, and many other subtle matters of state policy which are none of our business. Cf. id. at 1245.
 
 
 55
 In the reapportionment cases, the Equal Protection Clause generated a formula, "one person, one vote," which could be used to measure legislative apportionment and applied by state reapportionment commissions. We cannot derive from the Due Process Clause a formula which would say, "x population + y months delay + z types of claims for which a cause of action is recognized, in a hypothetical civil procedure framework of central calendaring, broad voir dire, and three years to serve process and substitute real for fictitious parties, yields n judges." At most, if we declared that the Constitution requires more than 238 judges for Los Angeles County, we could arm the Bar Association with a cudgel to use against competitors for state money in the legislature, and against the state attorney general in the state courts, as the state political process moved toward a compromise on some higher number.
 
 
 56
 The impossibility of deriving a standard from the Constitution bears both on justiciability and on whether to issue a declaratory judgment. Under Washington, declaratory relief is inappropriate, where it could not clarify and settle the legal issue, could not terminate the dispute, and could not end the uncertainty and controversy faced by the parties. Even if we had jurisdiction, it would be inappropriate to grant declaratory relief. Under Baker v. Carr, lack of judicially discoverable and manageable standards, and impossibility of resolution without policy determinations of a kind clearly for nonjudicial discretion, bear on justiciability. Baker, 369 U.S. at 217, 82 S.Ct. at 710. Even though state legislative apportionment is not committed to any branch of the federal government, the Court took pains to point out that the claim did not require it "to enter upon policy determinations for which judicially manageable standards are lacking," because Equal Protection standards were "well developed and familiar." Id. at 226, 82 S.Ct. at 714. This statement implies that even where a state rather than the federal government makes the decision, a federal court should consider, as a condition of justiciability, whether the case would require it to make policy determinations for which judicially manageable standards are lacking, and engage it in policy determinations "of a kind clearly for nonjudicial discretion." Id. at 217, 82 S.Ct. at 710.
 
 
 57
 The people of the State of California, through their elected representatives, are entitled in our system of federalism to decide how much of their money to put into courts, as well as the other activities in which they choose to have their state government participate. The process of deciding how much money to take away from people and transfer to the government, and how to allocate it among the departments of government, is traditionally resolved by political struggle and compromise, not by some theoretical legal principle. That process enables all the people to be heard on how their government should be run and their money spent, and to remove from office political officials who act contrary to the wishes of a majority. The judicial process does not share these democratic virtues. We do not have the power, in the circumstances of this case, to command the state, against the will of its elected representatives, to take money away from citizens in taxes, or from other governmental functions, in order to put more money into its court system. If, as I believe, we lack the power, then we have no occasion to explain why we will not exercise it in this case.
 
 
 
 [1]
 It appears that the county has exercised this option, so that 238 superior court judges currently serve Los Angeles County. In addition, the Los Angeles Superior Court is authorized to appoint 55 Court Commissioners "to perform subordinate judicial duties." Cal. Const. art. 6, § 22; Cal.Gov't Code § 69894.1 (West Supp.1992)
 
 
 [2]
 The Bar Association also brought claims for injunctive relief against Los Angeles County, the County Board of Supervisors, and the Los Angeles County Superior Court, alleging violations of 42 U.S.C. § 1983. These claims were voluntarily dismissed pursuant to Federal Rule of Civil Procedure 41(a)
 
 
 [3]
 The complaint mentioned a single lawsuit in Los Angeles County court in which the Bar Association was a party. It appears that lawsuit has been resolved during the pendency of these proceedings. Nonetheless, this appeal is not moot. The state officers conceded at oral argument that the Bar Association remains a party to other ongoing cases in Los Angeles County Superior Court
 
 
 [4]
 According to the Bar Association, section 69586 infringes upon both state and federal constitutional guarantees of access to the courts. Normally, we would consider first the validity of the section under the California constitution, to avoid addressing the federal constitutional issue. Hewitt v. Joyner, 940 F.2d 1561, 1565 (9th Cir.1991) (citations omitted) ("this court should avoid the adjudication of federal constitutional claims when alternative state grounds are available"), cert. denied --- U.S. ----, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). Here, however, the rights of access to the courts under the federal and state constitutions appear to be co-extensive. Payne v. Superior Court, 17 Cal.3d 908, 132 Cal.Rptr. 405, 553 P.2d 565, 570 n. 3 (1976) (en banc) (California constitution provides the same "basic guarantee" as the Fourteenth Amendment). Thus, we resolve both the state and federal constitutional claims in our discussion of the scope of the federal constitutional right
 
 
 [5]
 We note that California has substantially reduced this possibility by providing statutory trial preferences for litigants who are aged, very young, or ill. Cal.Code Civ.Proc. § 36 (West Supp.1992). Several types of actions also enjoy statutory preferences, including actions for declaratory relief, Cal.Code Civ.Proc. § 1062a (West 1980); actions for preliminary injunctions, Cal.Code Civ.Proc. § 527(a) (West Supp.1992); and certain family law actions, Cal.Civ.Code §§ 4600.6 (child custody), 4707 (child support) (West Supp.1983). Furthermore, any litigant may seek a special trial preference based on the unique circumstances of his or her case. Such a preference may be granted when the court determines that the interests of justice so require. Cal.Code Civ.Proc. § 36(d) (West Supp.1992)
 
 
 [6]
 Amici Orange County Bar Association et al. undercut the factual underpinnings of this argument somewhat by documenting delays in California's other urban counties