ROBERT M. PARKER, Circuit Judge,
dissenting:
I respectfully dissent. Judge Jolly’s attempt to excessively narrow Ex parte Young’s scope garners only a plurality of this court, and therefore, to use his language, it “is not binding authority to any.” I write to note his flawed treatment of Young and to present the traditional jurisprudential view of its scope, and to respond to the opinion to the extent it represents the court’s decision to dismiss this action against Appellants for lack of a “Case or Controversy.”
I.
I start by observing that the court’s decision does not entirely dispose of this action because the State remains as a named defendant. Appellees initially sued the Governor and the Treasurer in the district court. The Governor and Treasurer moved to dismiss per Fed.R.Civ.P. 12(b)(6), alleging that the Treasurer should be dismissed for failure to state a claim. The parties then stipulated to substitute the State for the Treasurer as a named defendant, and Appellants withdrew the motion to dismiss as moot. Appellants, *442 including the State, then filed an answer against Appellees’ claims. The State proceeded to litigate this action on the merits, never questioning the existence of jurisdiction until the panel dissent, sua sponte, raised the Eleventh Amendment and standing arguments. Therefore, the district court’s injunction is unaffected with respect to the State.
II.
A.
Act 825 is yet another attempt by the State to violate federal constitutional rights as construed by federal courts. As Judge Higginbotham observed:
This appeal is the latest episode in a long effort by Louisiana to exercise its police power over a practice to which the courts have given considerable protection. Indeed, the state seeks to “regulate abortion to the extent permitted by the decisions of the United States Supreme Court.” La.Rev.Stat. Ann. § 40:1299.35.0 (West Supp 1986). Although one would not think that there is anything inherently suspect about a state’s undertaking to regulate in the abortion area, Louisiana has repeatedly encountered constitutional objections to portions of its regulatory schemes.
Margaret S. v. Edwards, 794 F.2d 994, 996 (5th Cir.1986) (footnote omitted); see 22C La. Rev. Stat. Ann. 40:1299.35.0 (West 1992) (expressing “legislative intent” to defy Supreme Court authority on abortion). After a long history[1] of restricting a woman’s right to choose abortion, the State, by enacting Act 825, has now changed tactics and is attempting to ban abortion altogether by creating a private cause of action imposing unlimited liability on anyone performing an abortion. As the majority admits, Act 825 exposes anyone to “unlimited tort liability for any damage caused by the abortion procedure to both mother and ‘unborn child.’ ” Supra at 409. Liability is imposed for any “injury” to an “unborn child,” which means that liability can be imposed for the mere act of performing an abortion itself. Moreover, the person performing the abortion cannot avoid liability by obtaining informed consent from the patient. Informed consent “does not negate [the] cause of action, but rather reduces the recovery of damages.” § 9:2800.120(1). This is in stark contrast to the existing civil liability provision of the State’s informed-consent law, which provides a complete defense to malpractice claims if the physician complies with the law’s extensive requirements. 22C La. Rev.Stat. Ann. § 40:1299.35.6H (West 2000). Further, Act 825 provides no defense to malpractice suits for abortions performed in case of medical necessity or to protect the health of the patient. Finally, Act 825’s mischief is not limited to abortion providers. It covers a broad range of women’s health care providers, including physicians treating serious medical conditions such as infection or trauma, the treatment for which may include medically necessary abortion. It also includes manufacturers of contraceptives and the physicians and pharmacists who prescribe them. Thus, Act 825 imposes strict liability to anyone performing an abortion.
Such provisions confirm that Act 825 constitutes an undue burden on a woman’s right to choose an abortion because it has the purpose and effect of placing a sub *443 stantial obstacle hindering the exercise of that right. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 877, 112 S.Ct. 2791,120 L.Ed.2d 674 (1992) (joint opinion). By exposing any person performing an abortion to strict liability regardless of the person’s compliance with existing law, Act 825 is not designed to help a woman’s choice, but to eliminate that choice by effectively shutting down abortion providers. See id.; Hope Clinic v. Ryan, 195 F.3d 857, 876, 881 (Posner, C.J., dissenting). The fact that compliance with informed consent regulations does not negate liability proves that Act 825 is not designed to help a woman’s choice. Moreover, because it is undisputed that Act 825 will force Appellees, who provide substantially all of the abortion services within Louisiana, to cease operations, Act 825 places a substantial obstacle on the right to choose an abortion. Casey, 505 U.S. at 877, 112 S.Ct. 2791; Planned Parenthood v. Miller, 63 F.3d 1452, 1465 (8th Cir.1995).
In addition, it is clear that the State has enacted Act 825 in an attempt to circumvent federal court decisions upholding the right to choose an abortion. The State’s abortion code is codified in Title 40 of its Revised Statutes governing “Public Health and Safety,” and contains numerous regulations the violation of which gives rise to criminal and civil penalties. The State has buried Act 825 in its “Civil Code Ancillaries” section of its Revised Statutes, providing only civil remedies to private parties. By privatizing the enforcement of unlimited monetary damages, which is undoubtedly a state-sanctioned penalty, the State is attempting to avoid defending a patently unconstitutional law while simultaneously effecting a coercive impact so drastic that abortion providers have no choice but to cease operations. This purpose is illegitimate not only because Act 825 unduly burdens a constitutionally protected right, but also because it seeks to evade judicial review. However, Act 825 is not entirely novel in form; federal courts have consistently declared similar statutes to be unconstitutional.
B.
Since Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), individual women, abortion providers, and clinics ■ have invoked the federal judicial power to challenge abortion regulations by bringing actions pursuant to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), for declaratory and injunctive relief against state officials. Notwithstanding the fact that the Roe plaintiffs pregnancy had terminated and that no prosecution was threatened against her, the Supreme Court permitted her to challenge Texas’s criminal abortion law by suing a district attorney. Roe, 410 U.S. at 124-25, 93 S.Ct. 705. Similarly, the Court extended standing to abortion providers in Doe notwithstanding the fact that none were prosecuted or threatened with prosecution under Georgia’s abortion law. Doe, 410 U.S. at 188, 93 S.Ct. 739. While earlier abortion regulations imposed criminal liability for their violation, the inclusion of civil liability did not prevent aggrieved plaintiffs from challenging such regulations even though named defendants had no power to enforce such actions. E.g., Casey, 505 U.S. at 888, 112 S.Ct. 2791; Colautti v. Franklin, 439 U.S. 379, 383-84, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 83-84, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).
In Casey, the Supreme Court retained Roe’s essential holding and established the undue burden test for reviewing the constitutionality of state interference with a woman’s right to choose an abortion. 505 U.S. at 875, 112 S.Ct. 2791 (joint opinion). Significantly, the plaintiffs in Casey consisted of abortion providers and clinics suing, on behalf of their patients, the Pennsylvania governor and attorney general, just as in this case. The plaintiffs *444 brought suit before the effective dates of the challenged laws, just as in this case. The Court declared, inter alia, Pennsylvania’s spousal consent statute, which made a physician performing an abortion on a married woman without her spouse’s consent liable to the spouse for civil damages, unconstitutional. Id. at 887-98, 112 S.Ct. 2791. The Court reasoned that such provision would impose a substantial obstacle to the woman’s ability to obtain an abortion and would deter most women from obtaining an abortion as if the state had completely outlawed abortions. Id. at 893-94, 112 S.Ct. 2791. Such reasoning forms the basis of Appellees’ claims in this case.
In recent years, several circuits, including this court, have reviewed challenges to state abortion statutes under the Roe and Casey models and reached the merits of such challenges even when they included civil liability provisions not enforced by the state officers. See, e.g., Causeway Med. Suite v. Foster, 221 F.3d 811 (5th Cir.2000) (Jolly, J.), aff'g, Causeway Med. Suite v. Foster, 43 F.Supp.2d 604 (E.D.La.1999) (enjoining Louisiana governor and attorney general from enforcing the State’s partial-birth abortion statute, 22C La.Rev. Stat. Ann. § 40:1299.35.3, recodified in § 40:1299.35.16 (West Supp.2000), which, inter alia, provided a civil cause of action for damages against an abortion provider who violates the statute); Women’s Med. Prof'l Corp. v. Voinovich, 130 F.3d 187 (6th Cir.1997) (declaring unconstitutional Ohio abortion statute’s provision of strict civil liability for compensatory, punitive, and exemplary damages as well as costs and attorney’s fees against the physician for certain late-term abortions); Miller, 63 F.3d at 1456 n. 5. & 1467 (striking down provision of South Dakota abortion statute creating a civil cause of action for punitive and treble actual damages to a minor and parent, and declaring that “[t]he potential civil liability for even good-faith, reasonable mistakes is more than enough to chill the willingness of physicians to perform abortions in South Dakota.”). But see Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326 (11th Cir.1999) (holding that the Alabama governor, attorney general, and district attorneys were not proper defendants for the plaintiffs’ challenge to the civil liability provision of Alabama’s abortion statute); Hope Clinic v. Ryan, 195 F.3d 857 (7th Cir.1999) (en banc) (relying on Summit Medical and dismissing the plaintiffs’ challenge to Illinois and Wisconsin partial-birth-abortion statutes providing, inter alia, a civil cause of action because defendants — attorneys general and prosecutors — did not enforce such provisions), vacated on other grounds, 530 U.S. 1271, 120 S.Ct. 2738, 147 L.Ed.2d 1001 (2000).
The important lesson from the above decisions is that they involved actions brought pursuant to Young to enjoin state governors, attorneys general, and prosecutors from enforcing allegedly unconstitutional statutes before they became effective. While the challenged statutes contained both criminal and civil liability provisions, courts nonetheless reached the merits of the plaintiffs’ challenge to determine whether the statutes, including the civil liability provisions, imposed an undue burden on a woman’s right to choose an abortion. Only the Seventh and Eleventh Circuits dismissed the plaintiffs’ challenge to the civil liability provisions for lack of jurisdiction.
Under the relevant authority discussed above, we are not powerless to act in reviewing the judgment of the district court. Act 825 is similar to the statutes that were challenged pursuant to Young in the above decisions, but is also different because it only imposes civil liability. However, that difference should not conceal the fact that the State, by enacting Act 825, is attempting to regulate abortion providers by exposing them to unlimited strict liability for the mere act of performing an abortion. Such exposure is designed to eradicate all abortions by effectively shutting down Appellants’ operations, something the State *445 cannot do directly or indirectly. When this staggering effect is considered with the State’s patently illegitimate purpose of unduly burdening the right to abortion while evading judicial review by enacting Act 825, the court’s decision to dismiss this action excessively narrows the scope of Young’s principles and undermines the supremacy of federal rights.
III.
A.
The plurality’s most egregious error lies in its flawed and unnecessary revisionist interpretation of Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), Fitts v. McGhee, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899), and Young.[2] The plurality’s interpretation is simply unsupported by Young’s, express language and holding. In Young, the Supreme Court stated that the suit against the Nebraska attorney general in Smyth was not against the state because “[tjhere was no special provision in the statute as to rates, making it the duty of the attorney general to enforce it, but, under his general powers, he had authority to ask for a" mandamus to enforce such or any other law.” Young, 209 U.S. at 154, 28 S.Ct. 441 (emphasis added). After citing decisions supporting this holding, the Court stated:
The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.
Id. at 155-56, 28 S.Ct. 441 (emphasis added). Then, the Court, as the plurality correctly notes, distinguished Fitts from Smyth by noting that in Fitts
As no state officer who was made a party bore any close official connection with the act fixing the tolls, the making of such officer a party defendant was a simple effort to test the constitutionality of such act in that way, and there is no principle upon which it could be done. A state superintendent of schools might as well have been made a party.
Id. at 156, 28 S.Ct. 441 (emphasis added). The Court restated Fitts ’ holding as:
In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.
Id. at 157, 28 S.Ct. 441.
Most importantly, the plurality errs by not recognizing that Young limited Fitts ’ “close official connection” requirement by stating that
It has not, however, been held that it was necessary that such duty should be *446 declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed ..., but that may possibly make the duty more clear. The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.
Id. (emphasis added). In contrasting Smyth and Fitts, the Court in Young stated that Smyth involved “state officers specially charged with the execution of a state enactment,” and that such “special charge” was “sufficiently apparent when such duty exists under the general authority of some law, even though such authority is not to be found in the particular act. It might exist by reason of the general duties of the officer to enforce it as a law of the state.” Id. at 158, 28 S.Ct. 441 (emphasis added). The Court concluded that the officers in Fitts “had no duty at all with regard to the act.” Id. (emphasis added). The significance of all this is that in Young, the Court departed from Fitts ’ close connection or special relation requirement by inferring “some connection” to the challenged act from the attorney general’s general duty to enforce Minnesota’s laws and by virtue of his office. Id. at 160-62, 28 S.Ct. 441. In light of Young’s interpretation of Fitts, it is flatly wrong to assert Young and Fitts are consistent. See City of Altus v. Carr, 255 F.Supp. 828 (N.D.Tex.) (three-judge court), aff'd, 385 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966) (mem.); cf. Clyde E. Jacobs, The Eleventh Amendment and Sovereign Immunity 130-42 (1972) (noting the inconsistency between Fitts and Young).
Moreover, Justice Harlan, who wrote Smyth and Fitts, dissented in Young by stating that Fitts “is not overruled, but is, I fear, frittered away or put out of sight by [the Young majority’s] unwarranted distinctions.” Id. at 193, 28 S.Ct. 441 (Harlan, J., dissenting). Justice Harlan disagreed with the Young majority’s statement that In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887), was not controlling. Young, 209 U.S. at 189-90, 28 S.Ct. 441. Ayers involved a Virginia statute ordering state officials to sue to recover taxes from taxpayers who had used interest coupons on state bonds to pay their taxes. The Court in Ayers held that the taxpayers could not bring suit against the officials to enjoin them from enforcing the statute because such suit would be against the state. Justice Harlan’s dissent in Young argued that the barred suits in Ayers were identical to the ones in Young because they both involved suits against officers with no special duty to see to the enforcement of the statutes in question, and therefore such suits were effectively against the state. Id. at 203, 28 S.Ct. 441. Furthermore, Justice Harlan asserted that Fitts, which applied the principles of Ayers, was “[m]ore directly on point” in Young. Id. at 190, 28 S.Ct. 441. In addition, he noted that Smyth, which was “much relied” on by the majority, was distinguishable from Young’s facts because in Smyth Nebraska waived immunity from suit by virtue of a cause of action expressly granted to the railroads by the statute in question. Id. at 193-94, 28 S.Ct. 441. Justice Harlan feared that Fitts was “frittered away” because the majority’s reliance on Smyth to support jurisdiction was erroneous in light of Fitts ’ reaffirmation and application of Ayers. Cf. Richard H. Fallon et al., Hart & Wechsler’s The Federal Courts and The Federal System 1065-66 (4th ed.1996) (stating that Young undermined Ayers). Significantly, he stated: “The statutes in question did not impose upon the attorney general of Minnesota any special duty to see to their enforcement. In bringing the mandamus suit he acted under the general authority inhering in him as the chief law officer of his state.” Id. at 197, 28 S.Ct. 441 (emphasis added).
The plurality erroneously interprets Smyth, Fitts, and Young as a consistent *447 doctrine — a “triad” — emphasizing ' strict requirements that the officers sued have “some connection with the enforcement of the act” in question or be “specially charged with the duty to enforce the statute.” However, there is no “triad,” and the Young fiction is not recognized by any court as the “Smyth-and-Young-as-mmi-mized-by-Fitts ” exception to the Eleventh Amendment bar. There is no authority supporting Smyth, Young, and Fitts as a consistent line of decisions, and that contention is belied by Justice Harlan’s inability to distinguish the statute in Fitts from the statute in Young. Young, 209 U.S. at 193, 28 S.Ct. 441 (Harlan, J.) (“I am unable to distinguish [Fitts], in principle, from the one now before us.”). Further, the statutes in Young and Smyth were not in “sharp contrast” with the statute in Fitts because, according to Justice Harlan, there was no difference between the statutes in Young and Fitts, whereas the statute in Smyth expressly granted a cause of action to the railroads against the state. Id. at 193-94, 28 S.Ct. 441. More importantly, Young limits Fitts by finding the necessary “connection” between the officer and the act by “virtue of his office” whether it arises out of the general law or is specially created.
The plurality incredibly asserts that Young “has spawned numerous cases upholding, explaining, and recognizing its fundamental principle” to suggest that its interpretation is so widely accepted as to be beyond doubt. While I agree that Young has spawned numerous cases, not all of them have upheld or consistently applied its fundamental principle. The plurality’s suggestion that Young has been uniformly applied is an embellishment that defies even Young’s illogic. Indeed, the plurality only cites decisions to support its assertion but conspicuously omits contrary authority as if none exists. See, e.g., City of Altus, 255 F.Supp. at 835. Moreover, the decisions the plurality cites are hardly a representative sample of consistent applications of Young, and most are inappo-site to this action because they do not address actions pursuant to Young challenging abortion regulations.
In addition, the plurality’s statement that the “requirement that there be some actual or threatened enforcement action before Young applies has been repeatedly applied by the federal courts” is inaccurate. Numerous Supreme Court cases have relaxed the “threatened enforcement” requirement of Young in the abortion context. E.g., Casey, 505 U.S. at 845, 112 S.Ct. 2791 (reviewing pre-enforcement challenge to Pennsylvania’s abortion law); Doe, 410 U.S. at 186-88, 93 S.Ct. at 745 (permitting pre-enforcement challenge to Georgia abortion law even before the defendants threatened prosecution); Roe, 410 U.S. at 123-27, 93 S.Ct. at 712-13 (permitting pre-enforcement challenge to Texas abortion law despite the fact that the plaintiff was not pregnant). Other decisions directly contradict the plurality’s statement. See, e.g., Papasan v. Attain, 478 U.S. 265, 282 n. 14, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (holding that the Mississippi Governor and Secretary of State were proper defendants because of their “general supervision” over local officials administration of land set-asides for educational purposes); Voinovich, 130 F.3d at 210 (“Here, the prosecutors could charge plaintiff.”) (emphasis added); Los Angeles Bar Ass’n v. Eu, 979 F.2d 697 (9th Cir.1992) (holding that Young applied even though there was no enforcement by the defendant officials of the challenged statute governing judicial appointments by the defendants because “[The statute at issue] is simply not the type of statute that gives rise to enforcement proceedings.”); Luckey v. Harris, 860 F.2d 1012, 1015 (11th Cir.1988) (“Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity.”). In light of these decisions, to state that federal courts have repeatedly required the institution of some actual or threatened enforcement action before hearing officer suits mischaracter-izes existing law.
*448 B.
The plurality compounds its error in reinterpreting Young by formulating a “some connection” test that is so amorphous that even the plurality cannot precisely articulate what it measures. The test is initially stated as “whether the Young fiction requires that the defendant state official have some enforcement powers with respect to the particular statute at issue, or whether the official need have no such enforcement powers and only need be charged with the general authority and responsibility to see that all of the laws of the state be faithfully executed.” Supra at 416 (emphasis added). Then, this “test” is redrafted as gauging “(1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute.” Id. at 417 (emphasis added). However, the “test” undergoes a further revision when the plurality modifies the “demonstrated willingness” prong to include “the ability to act.” Id. at 421.
The plurality thus transforms' its reinterpretation of Young to create an erroneous test that undermines Young’s principle of permitting pre-enforcement officer suits to “vindicate federal rights and hold state officials responsible to ‘the supreme authority of the United States.’ ” Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting Young, 209 U.S. at 160, 28 S.Ct. 441). Without explanation, Young’s requirement that there be “some connection with the enforcement of the act” has been modified to something beyond “general authority and responsibility,” and then distilled to “statutory or constitutional powers.” However, this reformulation cannot be reconciled with Young’s express language that the connection or duty of an officer may arise, “by virtue of his office,” out of the “general law, or is specially created by the act itself.” Young, 209 U.S. at 157, 28 S.Ct. 441 (emphasis added); Papasan, 478 U.S. at 283 n. 14, 106 S.Ct. 2932; Luckey, 860 F.2d at 1016.
IV.
Nonetheless, even under this “test” Appellants have “some connection to the enforcement” of Act 825. A distinct nexus exists because Act 825 strips Appellees and other abortion providers of statutory limitations on medical malpractice liability they currently enjoy. § 9:2800.12(0(2). The Governor and Attorney General supervise and control the implementation of the statutory limitations of liability, codified in Title 40 of the State’s Revised Statutes. By exempting all claims brought pursuant to Act 825 from Title 40 coverage, Act 825 requires the Governor and Attorney General, and the entities and administrators they supervise and control, to enforce this exemption by disallowing any abortion provider’s claim to liability coverage whenever they are sued under Act 825.
Under Louisiana’s medical malpractice regime, total liability is capped at $500,000. 22C La.Rev.Stat. ANN. § 40:1299.42.B. However, any private doctor is liable only up to $100,000-any additional liability up to $500,000 is to be paid from a Patient’s Compensation Fund (“PCF”). § 40:1299.42.B; see also Kelty v. Brumfield, 633 So.2d 1210 (La.1994) (per cu-riam). The PCF is administered by the Patient’s Compensation Fund Oversight Board (“PCFOB”), a board in the office of the Governor with members appointed by the Governor. § 40:1299.44.D. The PCFOB may contest the quantum of damages, but not its liability. See Kelty, 633 So.2d at 1216.
The Office of Risk Management (“ORM”) is an office within the Governor’s Division of Administration and headed by the commissioner of administration, and is thus subject to the Governor’s direct control and supervision. §§ 39:3-5; 39:1528. The ORM appoints legal counsel for the PCF and establishes minimum qualifica *449 tion standards for such counsel. § 40:1299.41.J. Any liability incurred by the state is paid from the Self-Insurance Fund. § 39:1583. It is the duty of the Attorney General to appoint legal counsel to the Self-Insurance Fund, and the Attorney General must approve all settlements made by the Self-Insurance Fund over $25,000. §§ 39:1533.B; 39:1535.B(6).[3]
Under Title 40’s medical malpractice regime, all malpractice claims against state and private health care providers must be reviewed by a medical review panel before the claimant can file suit in court. §§ 40:1299.39.1; 40:1299.47. The state medical review panels are administered by the commissioner of administration, who is appointed and supervised by the Governor and serves at the Governor’s pleasure. §§ 40:1299.1.A(1); 39:1. The private medical review panels are administered by the PCFOB. §§ 40:1299.44D; 40:1299:47. The medical review panels are required to render expert opinions on each claim that are admissible in evidence in any subsequent court action, and members of the panel may be called as expert witnesses in the case. §§ 40:1299.39.1G, H; 40:1299.47.G, H; see also Everett v. Goldman, 359 So.2d 1256 (La.1978).
Under this regulatory scheme, the Governor and the Attorney General have the requisite connection to the enforcement of Act 825 to satisfy Young. The Governor appoints and supervises the board that reviews medical malpractice claims and the Attorney General supervises and oversees the appointment of counsel and the payments of settlements from the State’s funds, as well as representing the state’s interests against constitutional challenges. The Governor and the Attorney General, through their appointment and oversight responsibilities, must determine which malpractice claims are exempt from the medical malpractice regulatory scheme under Act 825. See Papasan, 478 U.S. at 283 n. 14, 106 S.Ct. 2932; cf. Eu, 979 F.2d at 704 (determining that Young’s, “connection” requirement was satisfied by the governor’s duty to appoint and fill positions and the secretary of state’s duty to certify elections, and stating that the statute in question “is not the type that gives rise to enforcement ” (emphasis added)).
For example, has a physician who provides a woman with an intrauterine device (“IUD”) performed an abortion?[4] Medical review panels will be required to review all medical malpractice actions arising out of the use of IUDs and determine whether the prescribing physician performed an “abortion” as defined by Act 825. The panels will likewise be called on to exercise discretion in applying the State’s malpractice regime in cases arising out of treatment of chorioamnionitis. When a woman develops this intrauterine infection early in a pregnancy, she and the *450 fetus may die if left untreated; however, the only available treatment will terminate the pregnancy. See WhitRidge at 751. Will the physician who treats the woman, saving her life but terminating the pregnancy, be held by the review panel to have performed an abortion and thus be disqualified for Title 40 protection? Such decisions employ, by statutory requirement, Appellants’ regulatory powers. In yet another example, abortion procedures may be coupled with the administration of anaesthesia or tubal ligation, which remain eligible for the medical malpractice regime. Medical review panels will be called on to “enforce” Act 825 by determining which claims to exclude from the medical malpractice regime. Cf. Eu, 979 F.2d at 704.[5] Pharmacologically induced abortions, caused by such agents as RU-486 or the “morning after pill” present still other enforcement questions because pharmacists, as well as physicians, are listed as “health care providers” for purposes of Title 40. See § 40:1299.41(A)(1). A physician, by prescribing RU-486, clearly performs an abortion under Act 825, since the drug accomplishes “the deliberate termination of an intrauterine human pregnancy after fertilization of a female ovum.” Medical review panels will therefore have to regulate the circumstances under which Act 825 denies limits on malpractice liability for claims relating to prescriptions for and use of for such drugs. Consider also the emergency room surgeon presented with a pregnant woman who, having sustained blunt trauma in an automobile crash or a domestic violence incident, has a ruptured uterus. Since the mandated treatment for such condition includes the deliberate termination of the pregnancy, will the Governor’s medical review panel deny the physician performing the procedure the protections of Title 40 and subject the doctor to unlimited liability for the death of the fetus? While far from exhaustive, these examples leave no doubt that the Governor and the Attorney General, through their supervision and control, have a routine, concrete role in enforcing Act 825.
We recently allowed health maintenance organizations (“HMOs”) to bring a preemptive action against the Texas attorney general and commissioner of insurance challenging a Texas act that, inter alia, creates a private cause of action for patients against their HMOs. Corporate Health Ins., Inc. v. Texas Dept. of Ins., 215 F.3d 526, 532 & n. 6 (5th Cir.2000) (Higginbotham, J.). In Corporate Health we held that the plaintiffs had standing and the defendants were properly named because of the defendants’ powers of appointment, supervision, and regulatory oversight over the Texas health insurance industry. We especially noted that the commissioner of insurance was a proper defendant given his “oversight authority” as was the attorney general because of his “regulatory reach” and general discretionary power to bring actions under the Texas Deceptive Trade Practices Act. Id. Such authority and power constituted sufficient connection to the enforcement of the challenged law, including the civil cause of action, to allow the suit to proceed pursuant to Young.
In light of Corporate Health, it is clear that “some connection” exists in this action by virtue of the Governor’s and Attorney General’s participation in the State’s extensive medical malpractice regime. No principled distinction can be made between Corporate Health and this action to conclude that case or controversy exists in the former but not the latter. In this action, *451 Appellants’ connection to the enforcement of Act 825 is equivalent to, if not greater than, the connection between the defendants and the challenged law in Corporate Health. The plurality’s statement that we are powerless to hear Appellees’ challenge in this case is contrary to Supreme Court law and conflicts with our reasoning and holding in Corporate Health.
V.
It is also apparent that Appellees have established a case or controversy against Appellants. Appellees’ standing is clearly supported by the relevant decisions noted above. E.g., Casey, 505 U.S. at 845, 112 S.Ct. 2791; Danforth, 428 U.S. at 88-84, 96 S.Ct. 2831; Colautti 439 U.S. at 384 n. 3, 99 S.Ct. 675; Voinovich, 130 F.3d at 192 n. 3; see also Corporate Health, 215 F.3d at 532; Causeway Med. Suite v. Ieyoub, 109 F.3d 1096, 1102 (5th Cir.1997). Notably, we have upheld Appellees’ standing to challenge a civil liability provision contained in the State’s partial-birth abortion statute against these same Appellants. Causeway Med. Suite, 221 F.3d at 811, ajfg, Causeway Med. Suite, 43 F.Supp.2d at 609-10.
The majority opinion, while conceding that Appellees have undoubtedly established an “injury-in-fact,” simply concludes that Appellants had not caused any injury to Appellees. Such conclusion ignores and is in conflict with the authority upholding standing for abortion providers and clinics asserting their own rights for potential injury to economic opportunity or liberty as well as the liberty interests of their patients. E.g., Singleton v. Wulff, 428 U.S. 106, 118, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); Causeway Med. Suite, 221 F.3d at 811; Causeway Med. Suite, 109 F.3d at 1102; Greco v. Orange Mem. Hosp. Corp., 513 F.2d 873, 875 (5th Cir.1975) (noting abortion provider’s individual economic and liberty interest in practicing medicine free from arbitrary restraints). More importantly, the majority fails to effectively analyze why the plaintiffs in Casey, Causeway Medical Suite, Voino-vich, Miller, and Corporate Health were able to successfully allege that a civil liability provision created an injury-in-fact traceable to the defendants when the named defendants had no ability to “enforce” the provision.
The majority summarily dismisses the existence of causation and redressability notwithstanding our past declaration that “the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases.” Margaret S., 794 F.2d at 997 (Higginbotham, J.) (citing Roe, 410 U.S. at 123-29, 93 S.Ct. 705, and Doe, 410 U.S. at 187-89, 93 S.Ct. 739). As discussed above, the threatened injury is exposure to unlimited damages for strict liability for performing abortions, which Appellants directly regulate. Moreover, we have held that “a plaintiff must establish that the injury is fairly traceable to the proposed government action or inaction.” Sierra Club v. Glickman, 156 F.3d 606, 613 (5th Cir.1998) (Benavides, J.) (emphasis added); Luckey, 860 F.2d at 1016. Appellees’ injury, risk of unlimited strict liability, is fairly traceable to Appellants’ role in Louisiana’s medical malpractice regime because Appellants will enforce Act 825 by excluding Appellees from Title 40 coverage for claims pursuant to Act 825-i.e., Appellants will enforce Act 825 by not acting under Title 40. This enforcement by “inaction” means that the PCFOB will not defend against the quantum of damages, the Governor (through his commissioner of administration) will not oversee the determination of liability, the Governor will not pay for the proceedings if a ruling is in favor of the abortion doctor, and the Attorney General will not have to appoint counsel or authorize any settlement in excess of $25,000.
Despite this rather simple chain of causation, the majority begs the question by concluding that because Act 825 is a private tort statute, Appellants have no coercive power sufficient to make the *452 necessary causal connection.[6] However, Appellants wield coercive power because their duty to execute and uphold the constitutionality of Act 825 constitutes the power to effectuate the Act’s coercive impact. See Mobil Oil Corp. v. Attorney General, 940 F.2d 73, 76-77 (4th Cir.1991) (noting that a case or controversy exists in a constitutional challenge to a private enforcement statute because the state official has sufficient adverse interests by having the power to intervene to defend the statute);[7] cf. Papasan, 478 U.S. at 283 n. 14, 106 S.Ct. 2932. Moreover, Appellees have asserted that Appellants’ failure to limit potential liability for claims based on abortion-related injuries by “acting” under Act 825 will cause the injury-in-fact. See Compl. for Decl. Relief HV at 3, reprinted in R. at 196. The majority’s flawed reasoning creates a double standard by which Appellants, who perform an unpopular but constitutionally protected procedure, are effectively barred from bringing any pre-en-forcement challenge in federal court, whereas similarly situated HMOs are free to demand a federal forum.[8]
*453 Lastly, the majority erroneously concludes that Appellees fail to satisfy the “redressability” requirement of standing because the injunction granted by the district court is “utterly meaningless.” Ironically, this is the same argument Appellants offered and we rejected in Causeway Medical Suite, 109 F.3d at 1102. There, these Appellants asserted that Appellees lacked standing to challenge judicial bypass procedures because they did not have “the power to enforce private-action court procedures.” Id. Appellants argued that the injunction in this case is “hypothetical and meaningless. ” Id. We rejected this argument under Casey. Id. More importantly, the majority reaches its conclusion without any authority, ignoring our “duty to decide the appropriateness and the merits of the declaratory request irrespective of [our] conclusion as to the propriety of the issuance of the injunction” in actions brought under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994). Steffel v. Thompson, 415 U.S. 452, 468, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (emphasis added); cf id. at 478, 94 S.Ct. 1209 (Rehnquist, J.) (“[The primary purpose of the Declaratory Judgment Act is] to enable persons to obtain a definition of their rights before an actual injury occurred.”). The Supreme Court has held that “it is not necessary to decide whether [a plaintiff’s] cause of action against the [defendant] based directly on the Constitution is in fact a cause of action on which [the plaintiff] could actually recover_ Instead the test is whether the cause of action alleged is so patently without merit as to justify the court’s dismissal for want of jurisdiction.” Duke Power v. Carolina Env’l Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (internal quotation marks omitted); see also Larson v. Valente, 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (“[A] plaintiff satisfies the redressa-bility requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.”). The majority’s fixation with the “meaning” of the injunction is not based on a rule of law, but rather on an arbitrary principle ignoring Louisiana law and designed to restrict access to federal courts.
A suit for declaratory and injunctive relief is the classic procedural mechanism for challenges to the constitutionality of state abortion statutes. E.g., Casey, 505 U.S. at 845, 112 S.Ct. 2791; Roe, 410 U.S. at 120, 93 S.Ct. 705; Doe, 410 U.S. at 185, 93 S.Ct. 739. Without regard to the meaning of an injunction, we have upheld the issuance of such injunction to enjoin these Appellants from enforcing a civil liability statute for damages for violation of Louisiana’s ban on partial-birth abortions. Causeway Med. Suite, 221 F.3d at 811, aff'g, Causeway Med. Suite, 43 F.Supp.2d at 619. Moreover, Appellees’ injury can be specifically redressed by an injunction against the Governor to order his agents and subordinates to disregard Act 825 in reviewing civil claims against women’s health care providers and making their legal and factual recommendations as to liability and damages. See § 39:4.C (“The division of administration shall exercise such other duties and functions germane to its primary functions as may be prescribed by law or as directed by the governor by executive order.”). It can further be redressed by an injunction against the Attorney General requiring him to appoint counsel to defend civil suits on an equal basis with non-abortion providers in medical malpractice cases. See § 39:1533.B.
VI.
Based on the foregoing, I conclude that the Eleventh Amendment does not bar consideration of this case in federal court and that Appellees have asserted a “Case or Controversy” against Appellants.

. Five years after Roe v. Wade, the State enacted an abortion regulation statute, but a district court struck down several provisions as unconstitutional. Margaret S. v. Edwards, 488 F.Supp. 181 (E.D.La.1980). The State promptly passed another statute that required, inter alia, costly and unnecessary ultrasound testing prior to abortion, hospitalization for post-first-trimester abortions, untenable presumptions of fetus viability, second opinions regarding necessity of an abortion to preserve a mother’s health, and parental consent without adequate judicial bypass provisions. A district court declared most of these provisions unconstitutional, Margaret S. v. Treen, 597 F.Supp. 636 (E.D.La.1984), and we affirmed that declaration. See Margaret S., 794 F.2d at 999.

. The plurality states that the parties "vigorously pressed” the jurisdictional arguments before this court by referring to Patsy v. Board of Regents, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In Patsy, the Supreme Court declined to rule on the Eleventh Amendment issue because it was only mentioned in passing by the state before four courts, which had not addressed it. The Supreme Court chose to rule upon the merits of the exhaustion of remedies issue, which was initially presented in a Rule 12(b)(6) motion to dismiss, because it was raised and decided by the district court and this court (both panel and en banc) and "vigorously pressed” before the Court. It light of Patsy’s procedural history, and in light of the fact that in this action we raised, and the parties briefed, the Eleventh Amendment issue on the court’s own initiative after the panel decision, it is improper to suggest that the parties pursued this issue with the same vigor as the parties in Patsy. See Coolbaugh v. Louisiana, 136 F.3d 430, 442 n. 5 (5th Cir.1998) (Smith, I., dissenting) (“Raising [the Eleventh Amendment issue] sua sponte is problematic ... in light of Patsy.'').

. In addition, the constitutionality of a statute may not be attacked in a declaratory judgment action unless the Attorney General is served with a copy of the proceeding, and the Attorney General is entitled to be heard and, at his discretion, to represent or supervise the representation of the interests of the state in the proceeding. See Vallo v. Gayle Oil Co., Inc., 646 So.2d 859 (La.1994) (citing La. Civ. Code art. 1880; La.Rev.Stat. Ann. § 49:257(B)); Bruneau v. Edwards, 517 So.2d 818, 824 (La.App. 1 Cir.1987).

. Medical authorities neither fully understand how IUDs work nor universally accept that IUDs are abortifacients, although there is strong evidence that an IUD prevents a con-ceptos (a fertilized female ovum, in the words of Act 825) from implanting in the uterine wall, thus terminating an intrauterine pregnancy. Compare John Whitridge, Williams Obstetrics 931 (18th ed. 1989) ("The mechanisms of action of the chemically inert device have not been defined precisely. Interference with successful implantation of the fertilized ovum in the endometrium seems to be the most prominent action.”) with How IUDs Prevent Pregnancy, Population Reports, Population Information Program of the Johns Hopkins School of Hygiene and Public Health v. XXIII no. 5 (1995) (reporting that studies suggest IUDs prevent sperm from fertilizing ova and do not support the common belief that they usually work by preventing implantation.); see also Leon Speroff, Clinical Gynecologic Endocrinology and Infertility 782 (5th ed. 1994).

. Beihesda Lutheran Homes and Servs., Inc. v. Leean, 122 F.3d 443 (7th Cir.1997) (Posner, J.) (holding that out-of-state residents excluded by state law from a program to subsidize in-state hospitals could, under Young, sue state officials responsible for administering the program to enjoin them from exclusion); Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1571 n. 9 (10th Cir.1995) (allowing, pursuant to Young, a suit by out-of-state residents against state officials to enjoin them from excluding the residents from a favorable method of obtaining hunting licenses).

. To this end, the majority's citation of Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911), and Gritts v. Fisher, 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912), is inapposite. Muskrat concerned Congress's statutory creation of jurisdiction in federal court allowing individuals to sue the United States for judicial review of the constitutionality of certain statutes. The Supreme Court held that such statutory creation of jurisdiction did not create a case or controversy because the United States had no interest or stake in the litigation adverse to the plaintiffs. In this action, Act 825 does not confer jurisdiction in federal court to sue a particular defendant, and it is clear that Ap-pellees have a distinct case or controversy against Appellants because Appellants’ interests are directly adverse to Appellees’ interests.
Moreover, contrary to the majority’s explanatory parenthetical that states that the defendant in Gritts was sufficiently adverse to the plaintiffs to create an Article III controversy, Gritts does not even mention Article III case or controversy requirements or standing. These decisions simply do not support the majority’s reasoning.

. The majority's interpretation of Mobil Oil belies the Fourth Circuit's express holding. Contrary to the majority’s conclusion that "controversy was founded upon the Attorney General’s explicit statutory authority,” the Fourth Circuit held that such statutory authority is "irrelevant” because "[wjhether Mobil has a dispute with its franchisees does not bear on whether it has a dispute with the Attorney General.” Mobil Oil, 940 F.2d at 76 (footnote omitted); see also id. n. 2 (" ’A controversy exists not because the state official is himself a source of injury but because the official represents the state whose statute is being challenged as the source of the injury.’ ” (quoting Wilson v. Stocker, 819 F.2d 943 (10th Cir.1987))). The court added tfhat even in private enforcement suits, the Attorney General "could intervene” to defend the constitutionality of the statute under 28 U.S.C. § 2403(b), and cited for support a private medical malpractice suit in which the Attorney General had so intervened. Id. at 76-77 (citing Boyd v. Bulala, 877 F.2d 1191 (4th Cir.1989)). Thus, Mobil Oil is properly read as equating an official’s independent power of enforcing a statute with the power to intervene in an action to defend that statute to create "an odor of a 'case or controversy’.” Id. at 77; see also id. at 75 ("[T]he Declaratory Judgment Act was designedf ] ... [to] encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state’s enforcement power.” (emphasis added))

.The majority's suggestion that Louisiana courts are available to hear Appellees' claims is untenable. To the extent the majority suggests that the Eleventh Amendment reflects a forum-selection theory, the Supreme Court in Alden v. Maine, 527 U.S. 706, 119 S.Ct. 2240, 2263, 144 L.Ed.2d 636 (1999), rejected such theory by holding that the Eleventh Amendment embodies a broad state sovereign immunity that applies in both federal and state courts. Id. {“Young is based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land.’’).
Moreover, according to a majority of current Supreme Court Justices it is improper to consider the availability of state courts in determining whether relief pursuant to Young is permissible. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 117 S.Ct. 2028, 2045, *453 138 L.Ed.2d 438 (1997) (O'Connor, J., joined by Scalia, Thomas, JJ., concurring); id. at 2048 (Souter, J., joined by Stevens, Ginsburg, Breyer, JJ., dissenting).